```
                                          ┌─────────────────────────────┐
                                          │ USDC SDNY                   │
UNITED STATES DISTRICT COURT              │ DOCUMENT                    │
SOUTHERN DISTRICT OF NEW YORK             │ ELECTRONICALLY FILED        │
------------------------------------X     │ DOC #:_____      │
TD BANK, N.A.,                      :     │ DATE FILED: 9/9/2020        │
                                    :     └─────────────────────────────┘
                  Plaintiff,        :
                                    :      18 Civ. 10608 (VM)
     - against -                    :
                                    :
BARBARA MILLER,                     :      **DECISION AND ORDER**
                                    :
                  Defendant.        :
------------------------------------X
```

**VICTOR MARRERO, United States District Judge.**

On October 15, 2019, Plaintiff TD Bank, N.A. ("TD Bank") filed a motion for summary judgment against Defendant Barbara Miller, seeking to collect a debt pursuant to a Guaranty of Payment (the "Guaranty") signed by Barbara Miller's late husband, Michael Miller. (See "Motion," Dkt. No. 24.) For the reasons set forth below, the Motion is GRANTED in part.

**I.   BACKGROUND**

A.   PROCEDURAL BACKGROUND

TD Bank commenced this action on November 14, 2018. In the Amended Complaint, filed on May 13, 2019, TD Bank alleges that, upon Michael Miller's death, Barbara Miller and others received certain property subject to TD Bank's claim against Michael Miller for amounts due under the Guaranty. (See "Amended Complaint," Dkt. No. 16.) In Count One of the Amended Complaint, TD Bank seeks a declaratory judgment setting forth the amount to which TD Bank is entitled under the Guaranty,

setting aside transfers of property as necessary to satisfy the amount TD Bank is due under the Guaranty, and authorizing TD Bank to attach or levy certain property to satisfy the amount it is due. In Count Two of the Amended Complaint, TD Bank asserts a fraudulent conveyance claim against Barbara Miller. Barbara Miller filed an Answer to the Amended Complaint on June 14, 2019. ("Answer," Dkt. No. 18.)

TD Bank filed the instant Motion on October 15, 2019, seeking summary judgment on Count One of the Amended Complaint. Barbara Miller filed a memorandum in opposition on November 15, 2019, and TD Bank filed a reply memorandum in further support of its Motion on December 6, 2019.

B.   FACTUAL BACKGROUND[1]

In 2014, Michael Miller executed the Guaranty, making him liable for up to $3.5 million in connection with two mortgage loan notes (the "Loans") that Woodbridge Center Realty Partners (the "Borrower" or "Woodbridge") executed in

---

[1] Except as otherwise noted, the following background derives from the undisputed facts as set forth by the parties in TD Bank's Local Rule 56.1 Statement of Undisputed Material Facts and Barbara Miller's responses thereto. (See "TD Bank SUMF," Dkt. No. 24-2; "Miller Resp. and Counterstatement," Dkt. No. 26-1.) The Court has also considered the full record submitted by the parties, including the following frequently-cited declarations and exhibits: the "Guaranty," Dkt. No. 24-6; the "Account Statements," Dkt. No. 24-11; and the "Estate Tax Return," Dkt. No. 24-10. No further citations to the record will be made herein except as specifically cited. The Court construes any disputed facts discussed in this section and the justifiable inferences arising therefrom in the light most favorable to the non-movant for each motion, as required under the standard set forth in Section II below.

favor of TD Bank. The first note, executed on October 3, 2012, had an original principle amount of $16 million and the second note, executed on April 17, 2014, had an original principal amount of $1.5 million.

The Guaranty provides that Michael Miller's $3.5 million liability cap "shall be reduced proportionately with each principal payment made by [Woodbridge] in accordance with the Loan amortization schedules" such that, when Woodbridge's "outstanding principal balance under the Loans is $13,500,000 or less, this Guaranty shall be extinguished and have no further effect." (Guaranty ¶ 30.)

The Guaranty also includes a choice-of-law provision, which states, "[t]his Guaranty and the rights and obligations of the parties hereunder shall in all respects be governed by, and construed and enforced in accordance with, the laws of the State of New Jersey." (Guaranty ¶ 24.)

Michael Miller died on December 17, 2016. Barbara Miller is his widow and the executrix of his estate.

As of October 18, 2018, the outstanding principal balance on the Loans was $15,638,247.30. Woodbridge's property was eventually sold at a mortgage foreclosure sale, through which TD Bank received approximately $10 million in net sale proceeds. TD Bank provides calculations, which exclude the foreclosure proceeds, and concludes that Michael

Miller owed TD Bank $1,847,304.63 under the Guaranty as of the date on which TD Bank commenced this action. Barbara Miller denies the accuracy of these calculations generally, while objecting in particular to TD Bank's failure to count the foreclosure proceeds as payments that reduce Michael Miller's liability. But aside from contending that the net foreclosure proceeds should be counted as a payment when computing the amount due under the Guaranty, Barbara Miller does not otherwise offer facts that call into question the accuracy of TD Bank's calculation of the amount due under the Guaranty.[2]

In her capacity as executrix, Barbara Miller filed a United States Estate Tax Return (the "Estate Tax Return") in March 2018. The Estate Tax Return demonstrates that Michael Miller's estate could not satisfy outstanding debts: it lists assets of the estate totaling $12,209,765 and debts totaling $15,665,461.

In the section that calls for the identification of property owned jointly by the decedent and his or her spouse, the Estate Tax Return lists three bank accounts (the "UBS Accounts") at UBS Financial Services Inc. ("UBS"), which collectively held $20,520,433. The funds in the accounts were

---

[2] As discussed in more detail below, the parties dispute how prejudgment interest should be calculated.

all earned by Michael Miller. Upon Michael Miller's death, the UBS Accounts transferred to Barbara Miller outside of the estate because she was a joint owner.

The parties dispute the value of the UBS Accounts. The UBS Accounts collectively held $20,768,756.90 as of December 1, 2016. But, according to Barbara Miller, calculating the value of the UBS Accounts requires offsetting the amount they held by Michael Miller's outstanding debt to UBS. Statements from UBS show that Michael Miller had a line of credit with UBS, which, as of December 1, 2016, had a balance of $16,975,884.31 (the "UBS Loan"). The Estate Tax Return indicates that the UBS Accounts were "pledged collateral account[s]." (Estate Tax Return at 10-11.) TD Bank concedes that the statements for the UBS Accounts contained a notation indicating that, as of December 1, 2016, the funds in the UBS Accounts were pledged to secure an obligation of another account.

In support of its argument that the Court need not take into account the UBS Loan when computing the value of the UBS Accounts, TD Bank contends that the UBS Loan was satisfied from sources other than the UBS Accounts. Between March 1, 2017 and March 30, 2017, the amount held in the UBS Accounts declined from $20,207,169.27 to $2,460.76. The UBS Loan was partially satisfied during March 2017 by a payment of

$61,070.56 from one of the UBS Accounts.[3] The March statement for the UBS Loan indicates that the remaining balance was satisfied by a transfer of $17,019,224.47 on March 20, 2017 from an account that was not listed on the Estate Tax Return and for which TD Bank has not provided records. TD Bank asserts that, after the UBS Loan was satisfied, Barbara Miller transferred over $20 million from the UBS Accounts to other bank accounts in her name between March 20, 2017 and March 24, 2017.[4]

Barbara Miller denies TD Bank's assertion. She claims that the UBS Loan was transferred to her as the survivor, re-financed in her name, and ultimately satisfied using funds that were in the UBS Accounts. She contends that she then used the funds remaining after the satisfaction of the UBS Loan to pay her debts, her living expenses, Michael Miller's debts, and Michael Miller's estate's debts.

---

[3] According to TD Bank, that the end-of-March 2017 statements for the UBS Accounts did not contain a notation indicating that the funds were pledged to secure an obligation of another account suggests that the UBS Loan was satisfied from sources other than the UBS Accounts. But, since the amount in the accounts had already declined to less than $3,000 when the March statement was issued, the absence of the notation is fully consistent with funds from the UBS Accounts having been used to satisfy the UBS Loan.
[4] TD Bank has not provided statements for the accounts to which funds were transferred.

Regardless, it is clear that, at the time of Michael Miller's death, the UBS Accounts held over $3.4 million in excess of the amount required to satisfy the UBS Loan.[5]

C.    THE PARTIES' ARGUMENTS

TD Bank argues that, pursuant to the terms of the Guaranty, it is owed $1,847,304.63 plus prejudgment interest and attorneys' fees. As discussed above, the Guaranty provided that Michael Miller's liability would be reduced "with each principal payment made by [Woodbridge] in accordance with the Loan amortization schedules" until the principle balance was equal to or less than $13,500,000. (Guaranty ¶ 30.) TD Bank asserts that only payments from Woodbridge, not proceeds from a foreclosure sale, decrease Michael Miller's liability. Since Woodbridge did not make payments to reduce the principle balance below $13,500,000, TD Bank maintains that Michael Miller's liability under the Guaranty has not been extinguished.

TD Bank argues that it can reach Michael Miller's half-interest in the UBS Accounts to satisfy the Guaranty. According to TD Bank, New York law permits creditors to access jointly held bank accounts when the decedent maintained the power to dispose of the property in the account during his or

---

[5] As of December 30, 2016, the UBS Accounts collectively held $20,482,689.70, while the UBS Loan had a balance of $17,004,619.18, leaving an excess of $3,478,070.52 in the UBS Accounts.

her lifetime. Further, TD Bank asserts that creditors can reach a joint account even when the account's transfer from the decedent to the other joint account holder was not a fraudulent conveyance. TD Bank asserts that the New York Court of Appeals applied this rule in Matter of Granwell, 228 N.E.2d 779 (N.Y. 1967), when it held that a decedent's statutory half-interest in jointly held funds was subject to the claims of a creditor.

In the instant case, TD Bank points to Michael Miller's transfers into and out of the UBS Accounts prior to his death as evidence of his continuing power to dispose. TD Bank asserts that over $20 million remained in the UBS Accounts after satisfaction of the UBS Loan, which occurred within three months of Michael Miller's death. Therefore, TD Bank argues, Michael Miller's statutory half-interest in the UBS Accounts amounts to over $10 million -- more than enough to satisfy its claim of $1,847,304.63 plus prejudgment interest and attorneys' fees.

TD Bank additionally argues that because Barbara Miller did not contribute to the UBS Accounts and was added to the UBS Accounts as a matter of convenience, TD Bank could -- but need not -- access Barbara Miller's presumed half-interest under New York law.

TD Bank contends that, because the claims in this diversity action are governed by New York law, it is entitled to prejudgment interest at the New York statutory rate. TD Bank further asserts that the terms of the Guaranty entitle it to reasonable attorneys' fees.

In opposition, Barbara Miller argues that New Jersey law governs. She asserts that the parties expressly bargained for their rights and obligations under the Guaranty to be governed by New Jersey law. She additionally claims that New Jersey law should apply because the Loans and Mortgage underlying the Guaranty are governed by New Jersey law, the property securing the mortgage is in New Jersey, and TD Bank's headquarters are in New Jersey.

Barbara Miller argues that New Jersey law mandates that foreclosure proceeds be credited to reduce Michael Miller's liability under the Guaranty. She also quotes the provision in the Guaranty that states, "At such time when the outstanding principal balance under the Loans is $13,500,000.00 or less, this Guaranty shall be extinguished and have no further effect." (Guaranty ¶ 30.) Relying on this language, Barbara Miller asserts that Michael Miller's obligations are necessarily extinguished because the net foreclosure proceeds reduced the outstanding principal balance below $13,500,000.00. In further support of this

argument, Barbara Miller emphasizes that the Guaranty must be construed in favor of the private guarantor, Michael Miller, and against the drafter, TD Bank.

Barbara Miller contends that New Jersey law does not permit creditors to satisfy debt from a decedent's non-probate assets, such as the UBS Accounts. She notes that Title 3b, Section 22-40 of the New Jersey Statutes holds "heirs and devisees" liable to pay for a decedent's debt using property that passed to them "by reason of the descent or devise." See N.J. Stat. Ann. § 3B:22-40 (West 2020). Barbara Miller asserts that non-probate property does not pass from a decedent through descent or devise, and, therefore, that New Jersey statutes do not render recipients of non-probate assets liable for the debts of the decedent.

Barbara Miller argues that, even if New York law applied, TD Bank would not be able to reach more than Michael Miller's half-interest in the UBS Accounts because TD Bank has not rebutted the presumption of joint tenancy. She contends that her purported failure to contribute money to the UBS Accounts is not sufficient to rebut the presumption of joint tenancy.

Finally, Barbara Miller asserts that, because the claims are governed by New Jersey law, New Jersey law also governs the calculation of prejudgment interest.

In its reply brief, TD Bank responds that Barbara Miller's interpretation of the Guaranty renders the Guaranty illusory. TD Bank emphasizes that if liability under the Guaranty could be extinguished so long as TD Bank received net proceeds of over $4 million from a foreclosure sale, the Guaranty would not provide meaningful security for the $17.5 million Loans. TD Bank points out that Michael Miller's liability under the Guaranty was capped at $3.5 million. According to TD Bank, the reasonable interpretation of the Guaranty is that the parties must have assessed the real property to be worth $13.5 million and intended the Guaranty to secure the portion of the Loans left unsecured by the real property. TD Bank cites cases from outside New York and New Jersey in which courts interpreted guarantees as remaining in effect to the extent that proceeds from the sale of collateral did not fully satisfy a loan.

Further, TD Bank maintains that New York law governs the claims. First, TD Bank asserts that, when sitting in diversity, federal district courts resolve choice-of-law issues -- including determining the scope of a contractual choice-of-law provision -- according to the forum state's choice-of-law principles. Second, TD Bank argues that, according to New York law, its ability to collect from the UBS Accounts is outside of the scope of the choice-of-law

provision in the Guaranty. Accordingly, TD Bank insists that the law of the place where the UBS Accounts are located -- New York -- governs TD Bank's ability to collect from those accounts. Relatedly, TD Bank observes that the UBS Client Relationship Agreement, to which Michael Miller agreed when he opened the UBS Accounts, provides that the UBS Accounts are governed by New York law.

TD Bank does not affirmatively argue that New Jersey law permits it to collect from the UBS Accounts. However, TD Bank does contend that the cases Barbara Miller cites for the proposition that New Jersey law protects non-probate assets from decedents' creditors are inapposite. According to TD Bank, those cases address individual retirement accounts, insurance proceeds, and deferred compensation plans -- asset categories that federal and New Jersey statutes specifically protect from creditors' claims.

## II.   LEGAL STANDARD

In connection with a motion for summary judgment under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper if, viewing all the facts of the record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." Samuels v. Mockry, 77 F.3d 34, 35 (2d Cir. 1996) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986)). The role of a court

in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987).

The moving party bears the burden of proving that no genuine issue of material fact exists or that, because of the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. See Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223–24 (2d Cir. 1994). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact." Anderson, 477 U.S. at 247–48 (emphasis in original).

In determining whether the moving party is entitled to judgment as a matter of law, the court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). Though a party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d

Cir. 1998), summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in favor of the opposing party. See Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

### III. DISCUSSION

#### A.   LIABILITY UNDER THE GUARANTY

Under any reasonable interpretation of the Guaranty's language, Michael Miller remains obligated. As discussed above, in a paragraph titled "Guaranty Limitation," the Guaranty provides that the:

> Guaranty cap [of $3,500,000] shall be reduced proportionately with each principal payment made by [Woodbridge] in accordance with the Loan amortization schedules. At such time when the outstanding principal balance under the Loans is $13,500,000,00 or less, this Guaranty shall be extinguished and have no further effect.

(Guaranty ¶ 30.) Thus, Michael Miller agreed that he would pay up to $3,500,000. And, he agreed that the Borrower's principal payments, made "in accordance with the Loan amortization schedules," would be the means by which his liability would be reduced. The "amortization schedules" list the required monthly payments to be made by Woodbridge.

Barbara Miller asserts that the proceeds from the foreclosure sale qualify as payments by Woodbridge and, by reducing the principal balance on the Loans to less than $13.5 million, extinguish Michael Miller's liability. But

foreclosure proceeds are not principle payments "made . . . in accordance with the Loan amortization schedules." (Guaranty ¶ 30.)

Moreover, several provisions in the Guaranty explicitly state that Michael Miller's liability will not be extinguished by foreclosure. First, a paragraph titled "Unconditional Guaranty" provides:

> This Guaranty is an absolute, unconditional, present and continuing guaranty of payment and performance and not of collection and is in no way conditioned or contingent upon any attempt to enforce any of either Beneficiary's rights against Borrower or to collect from the Borrower or upon any other condition or contingency. Beneficiaries shall have the right to proceed against any Guarantor immediately upon . . . any "Event of Default" . . . without taking any prior action or proceeding . . . for the liquidation or foreclosure of any security Beneficiaries at any time hold pursuant thereto.

(Guaranty ¶ 3.) This section provides that, upon default, TD Bank can collect from Michael Miller without first pursuing foreclosure and, indeed, regardless of whether it enforces any of its rights against Woodbridge. The Guaranty also provides that:

> No Guarantor's liability hereunder shall in any way be limited or impaired by . . . foreclosure of the Notes of Mortgage or any sale or transfer of all or part of the property covered by the Mortgage . . . .

(Guaranty ¶ 4.) This language makes clear that foreclosure proceeds do not limit or extinguish Michael Miller's liability.[6]

Indeed, New Jersey courts hold that such language is indicative of an "unconditional guarantee." See, e.g., Resolution Tr. Corp. v. Berman Indus., 271 N.J. Super. 56, 65-67 (N.J. Super. Ct. Law. Div. 1993). Unconditional guarantees permit the creditor to move against the guarantor "regardless of whether" the creditor has sought foreclosure, so long as the creditor's total recovery does not exceed the total amount of its loss. Resolution Tr., 271 N.J. at 67; see Summit Tr. Co. v. Willow Bus. Park, 269 N.J. Super. 439, 444-45 (N.J. Super. Ct. App. Div. 1994) (explaining that a creditor could collect on an unconditional guaranty "without prior recourse to foreclosure" but could not recover more than it was due if it both pursued the guarantor and chose to foreclose).

In fact, New Jersey law would permit TD Bank to enforce the Guaranty against Michael Miller even if the Guaranty did not contain these unconditional terms. In 1923, the New Jersey

---

[6] Barbara Miller asserts that courts must construe guarantees in favor of the private guarantors and against the drafters and, accordingly, that the Guaranty should be interpreted as providing that foreclosure proceeds may extinguish the Guaranty. However, the Guaranty's language is not ambiguous; no reasonable interpretation, not even one favoring Michael Miller, would release Michael Miller from liability.

Court of Errors and Appeals -- then the highest court in the state -- held that guarantees remain in effect, unless foreclosure proceeds fully satisfy the debt:

> The guaranteed holder of a mortgage is certainly entitled to recover from his guarantor the deficiency on his mortgage debt as ascertained upon a foreclosure sale for, by statute, the first proceeding is to foreclose the mortgage, if the mortgaged premises do not sell for a sum sufficient to satisfy the mortgage debt, etc., then it is lawful to proceed on the bond for the deficiency.

Bradley v. Atl. Guaranty & Title Ins. Co., 121 A. 626 (N.J. 1923). New Jersey law continues to permit creditors to pursue the guarantor of a loan after foreclosing on property securing the loan. See N.J. Stat. Ann. § 2A:50-2 (West 2020) (providing that in order to collect debt, a lender must "first . . . foreclos[e]" and then pursue "an action on the bond or note for any deficiency"); N.J. Stat. Ann. § 2A:50-2.3 (West 2020) (exempting from the foreclosure first requirement certain categories of transactions, including loans "for a business or commercial purpose"); see also West Pleasant-CPGT, Inc. v. U.S. Home Corp., No. 082981, 2020 WL 3815975, at *9 (N.J. July 8, 2020) (describing historical and current statutes). Accordingly, in Resolution Trust, the Court explained that even absent contractual language rendering the guarantee unconditional, the lender had the statutory right to pursue

the guarantor of a loan after foreclosure. 271 N.J. Super. at 67.

As alluded to above, New Jersey Courts have historically exercised their equitable powers to prevent creditors from obtaining a windfall. See id. at 63. More specifically, a debtor may be entitled to a fair market value credit if a court determines that he should be protected from liability "for more than the difference between the fair market value of the [foreclosed] property and the mortgage debt." West Pleasant-CPGT, 2020 WL 3815975, at *10. But Barbara Miller does not argue that TD Bank would obtain a windfall if the Court enforces the Guaranty. She does not claim that the property sold for less than its fair market value at the foreclosure sale. Cf. Borden v. Cadles of Grassy Meadows II, 412 N.J. Super. 567, 568 (N.J. Super. Ct. App. Div. 2010). And she acknowledges that, after taking into account the foreclosure proceeds, the outstanding principal indebtedness of approximately $6.8 million exceeds the amount that TD Bank seeks to recover based on the Guaranty.

In sum, the terms of the Guaranty make clear that foreclosure proceeds do not reduce or extinguish Michael Miller's liability. The result of that interpretation in this case is fully consistent with New Jersey law, which permits

creditors, after foreclosing, to pursue guarantors to recover up to the full amount of the debt.

B.    TD BANK'S ABILITY TO REACH FUNDS IN THE UBS ACCOUNTS

    1.    Choice of Law

The parties dispute whether New York or New Jersey law governs the question of TD Bank's ability to reach funds in the UBS Accounts. The Court must apply New York choice-of-law principles to determine which state's law applies. See In re Coudert Bros. LLP, 673 F.3d 180, 186 (2d Cir. 2012) ("When a federal district court sits in diversity, it generally applies the law of the state in which it sits, including that state's choice of law rules.").

In New York, "[c]hoice of law is decided on an issue by issue basis." See Lumbermens Mut. Cas. Co. v. Flow Int'l Corp., 844 F. Supp. 2d 286, 300 (N.D.N.Y. 2012); Restatement (Second) of Conflict of Laws § 145(1) (Am. Law Inst. 1971). For each issue, "the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." See, e.g., Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 393 (2d Cir. 2001) (quoting Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998)). An "actual conflict" exists when the relevant laws of each jurisdiction would "have the potential to affect the outcome of the case significantly." 2002 Lawrence R. Buchalter Alaska

Tr. v. Phila. Fin. Life Assurance Co., 96 F. Supp. 3d 182, 199-200 (S.D.N.Y. 2015) (quoting Horton v. Greenwich Hosp., No. 12 Civ. 4436, 2014 WL 956468, at *2 n.1 (S.D.N.Y. Mar. 10, 2014)). The Court need not determine that the final result would differ under the laws of the competing jurisdictions. See Fin. One Pub. Co. v. Lehman Bros. Special Fin., 414 F.3d 325, 331 (2d Cir. 2005) (explaining that "[s]uch a requirement would be absurd"), cert. denied, 548 U.S. 904 (2006). Rather, an actual conflict exists when "the applicable law from each jurisdiction provides different substantive rules," and the differences "have a significant possible effect on the outcome." Id. (quoting Curley, 153 F.3d at 12, Tronlone v. Lac d'Amiante Du Quebec, Ltee, 747 N.Y.S.2d 79, 80 (App. Div. 1st Dep't 2002), and Simon v. Philip Morris, Inc., 124 F. Supp. 2d 46, 71 (E.D.N.Y. 2000)).

Accordingly, the Court must compare the law of New York and New Jersey on the issue at hand -- TD Bank's ability to reach the funds in the UBS Accounts -- to determine whether the laws differ in a potentially significant way. If they do conflict, the Court must proceed to determine which state's law should apply.

a.   New York Law

Pursuant to Section 675 of the New York State Banking Law, the creator of a joint bank account is presumed to (a)

have made an irrevocable gift of one-half of the account to the other joint owner, and (b) intend for the second half of the account to vest in the survivor upon the death of one of the joint account holders. N.Y. Banking Law § 675 (McKinney 2020); Hon. Eve Preminger et al., Trust and Estates Practice in New York § 1:99 (2019-2020 ed. 2019). Still, each joint owner is permitted "to withdraw a moiety," a half-interest, "or less and thus destroy the joint tenancy as to such withdrawals." Bricker v. Krimer, 191 N.E.2d 795, 797 (N.Y. 1963). As such, the joint tenants' survivorship right to the depositor's moiety is not irrevocably "vested" in the designated survivor when the joint account is created. See Granwell, 228 N.E.2d at 782 (holding, pursuant to N.Y. Debt. & Cred. Law § 273, "although transfer of interest [is] projected, it [is] not actually completed until" the death of one of the joint tenants); City Bank Farmers Tr. Co. v. Cannon, 51 N.E.2d 674, 676 (N.Y. 1943).

Relying on Granwell, 228 N.E.2d 779, and Article 10 of New York's Debtor and Creditor Law, TD Bank asserts that creditors may satisfy a decedent's debt with funds from a jointly held bank account if the decedent joint owner maintained the power to dispose of the assets in the account during his lifetime -- even if the transfer to the surviving joint owner upon the decedent's death did not constitute a

fraudulent conveyance. Granwell does not support that proposition. In Granwell, the New York Court of Appeals reasoned that it "would violate the spirit and purpose of both the Surrogate's Court Act and the Uniform Fraudulent Conveyances Act (Debtor and Creditor Law, art. 10)" to prevent creditors from reaching the decedent's moiety after his death when they would have been able to reach the property during the decedent's lifetime. See id. at 782. But, in reaching its decision, the Court of Appeals drew attention to another critical fact: that the transfer of the decedent's moiety upon his death rendered his estate "insolvent" such that the estate was insufficient to satisfy the debt. See id. at 783. The court noted the estate's insolvency made the "gratuitous conveyance" from decedent to surviving owner "fraudulent as to creditors." Id.

Indeed, New York State's Appellate Division cases consistently read Granwell as requiring a showing of estate insolvency -- constituting constructive fraudulent transfer -- for creditors to reach a decedent's moiety. See, e.g., St. Teresa's Nursing Home v. Vuksanovich, 702 N.Y.S.2d 92, 94 (App. Div. 2d Dep't 2000) (citing N.Y. Debt. & Cred. art. 10) (holding the plaintiff could reach the decedent's half interest where the conveyance from the decedent to the survivor rendered the decedent's estate insolvent); Gallagher

v. Kirschner, 632 N.Y.S.2d 857, 858 (App. Div. 3d Dep't 1995) ("Even where the transfer occurs by operation of law upon the death of a joint tenant, a creditor may recover the interest transferred, as a fraudulent transfer, if it can be demonstrated that the transfer rendered the deceased debtor's estate insolvent.") (emphasis added); Kashan v. Kosoff, 491 N.Y.S.2d 801, 802 (App. Div. 2d Dep't 1985) ("[I]f it can be proven that the transfer of the property by operation of law to respondent rendered decedent's estate insolvent (as plaintiff also alleges) plaintiff may recover to the extent of a one-half interest in such property.").

Thus, under New York law, a creditor may reach a decedent's half-interest in a joint bank account if the decedent had the power to dispose of his interest during his lifetime and the gratuitous transfer of the moiety upon his death renders his estate insolvent. See, e.g., Granwell, 228 N.E.2d at 782-83.

New York law allows a creditor to reach the entirety of a joint bank account only if the creditor provides "direct proof that no joint tenancy was intended or substantial circumstantial proof that the joint account had been opened for convenience only." Fragetti v. Fragetti, 692 N.Y.S.2d 442, 443 (App. Div. 2d Dep't 1999). In this context, "convenience" refers to the convenience of the pre-existing

account owners. See id. For example, where evidence indicates that parents added an adult child's name to their account so that the child would be able to manage the parents' affairs in the event of the parents' illness or disability, the child is not deemed to have a joint interest in the account. See id.

Relying exclusively on Fragetti, TD Bank contends that the presumption of joint tenancy may be rebutted where one of the account holders was the source of all the funds in the joint accounts. But Fragetti does not support TD Bank's characterization of the law. Rather, in Fragetti, the court considered a variety of factors, including that the daughter had never made any deposits or withdrawals and had not reported interest earned on the account as income. See id. Indeed, New York courts generally consider the totality of circumstances to assess whether the depositor of the funds intended to create a joint tenancy. See Walsh v. Keenan, 59 N.E.2d 409, 412 (N.Y. 1944) (deeming presumption of joint tenancy rebutted by pre-existing holder's complete withdrawals from joint account and her exclusive control over the passbook); Lagnena v. Lagnena, 215 N.Y.S.2d 542, 543 (App. Div. 2d Dep't 1995) (finding presumption of joint tenancy rebutted where wife was source of all funds and had "sole control over" the joint accounts); Filippi v. Filippi, 384

N.Y.S.2d. 1010, 1011 (App. Div. 2d Dep't 1976) (similar).
Thus, while the source of the funds is a relevant
consideration, it is not necessarily a dispositive one.

   b.   New Jersey Law

   Barbara Miller argues that New Jersey law does not allow
creditors to satisfy a decedent's debt out of any non-probate
asset that passes to another by operation of law. In New
Jersey, joint accounts do pass to surviving parties outside
of the estate. See N.J. Stat. Ann. § 17:16I-5 (West 2020)
("Sums remaining on deposit at the death of a party to a joint
account belong to the surviving party or parties as against
the estate of the decedent unless there is clear and
convincing evidence of a different intention at the time the
account is created."). However, the cases Barbara Miller
cites do not establish that joint accounts are shielded from
creditors.

   First, Barbara Miller cites Hart v. Semon, No. A-1440-
10T2, 2013 WL 1704990, at *2 (N.J. Super. Ct. App. Div. Apr.
22, 2013), which states that life insurance proceeds,
retirement plans, ERISA benefits and deferred compensation
plans are protected from creditors upon the death of the
owner. However, these categories of assets are specifically
shielded from creditors by statutes that do not shield joint
bank accounts. See id. at *4-5 (explaining that New Jersey

25

statutory law shields IRAs, 401-Ks, and life insurance proceeds from creditors, and federal statutory law shields ERISA benefits and qualified pension plans not paid to the decedent before his death). Barbara Miller similarly cites Fitzgerald v. Linnus, 336 N.J. Super. 458, 473 (App. Div. 2001) for the proposition that non-probate assets are beyond the reach of creditors, but that case deals only with the transfer of a life insurance policy. Moreover, the language Barbara Miller quotes from the case is a factual description of the decedent's *intention* to protect his non-probate assets from creditors, not a statement of the law.

Finally, Barbara Miller asserts that surviving owners of non-probate assets are not liable for debts of the decedent pursuant to Title 3b, Section 22-40 of the New Jersey Statutes. The statute states that heirs receiving assets passed by "descent or devise" are liable for debts of the decedent. See N.J. Stat. Ann. § 3B:22-40 (West 2020). Because non-probate assets do not pass by "descent or devise," Barbara Miller reasons that recipients of non-probate assets are not subject to the same liability. But the statute does not support Barbara Miller's argument. It merely imposes liability on heirs; it does not preclude the same liability from being imposed on surviving owners of non-probate assets. See id.

26

Although TD Bank persuasively argues that cases regarding life insurance proceeds, IRAs, 401-Ks, ERISA benefits and qualified pension plans, are inapposite, TD Bank does not supply any New Jersey law regarding creditors' access to decedents' joint bank accounts.

Title 17, Section 16I-7 of the New Jersey Statutes provides that "if other assets of the estate are insufficient" to pay the debts of the decedent, no "multiple-party account" will be permitted to transfer to the account survivor. See N.J. Stat. Ann. § 17:16I-7 (West 2020). Instead, surviving parties to a joint account "shall be liable to account to [the decedent's] personal representative [i.e. executor][7] for amounts the decedent owned beneficially immediately before his death to the extent necessary" to satisfy remaining debts. Id. Further, "[s]ums recovered by the personal representative [from the surviving parties] shall be administered as part of the decedent's estate." Id. That is, Barbara Miller was required to provide to the estate amounts Michael Miller owned beneficially before his death as needed to satisfy his debt to TD Bank.

A decedent's beneficial ownership during his lifetime -- the amount a creditor may access in a joint bank account

---

[7] Title 3A, Section 2A-1 of the New Jersey Statutes defines "personal representative" as including executors. N.J. Stat. Ann. § 3A:2A-1(q).

-- is "in proportion to the net contributions [made] by each" joint owner to the account. Id. § 17:16I-4 (determining ownership during the lifetime of joint account holders); see id. § 17:16I-3 (indicating that sections 4 to 6 of the present chapter define "beneficial ownership"). In the absence of proof of net contributions, a joint account "belongs in equal shares to all parties having present right of withdrawal." See id. § 17:16I-4.

    c.   Actual Conflict

An actual conflict of law exists because the differences between New York and New Jersey law have the "potential to affect the outcome of the case significantly." See 2002 Lawrence R. Buchalter Alaska Tr., 96 F. Supp. 3d at 199-200.

Both jurisdictions allow creditors to reach joint bank accounts where, as here, the decedent's estate cannot satisfy outstanding debt. See N.J. Stat. Ann. § 17:16I-7 (West 2020) (when the estate is "insufficient"); Granwell, 228 N.E.2d at 783 (when the estate is "insolvent").[8] However, New York law would permit TD Bank to reach only Michael Miller's half-interest in the account, unless TD Bank offered "direct proof that no joint tenancy was intended or substantial

---

[8] As discussed above, TD Bank has established that Michael Miller's estate could not satisfy outstanding debts: the Estate Tax Return listed assets of the estate totaling $12,209,765 and debts totaling $15,665,461.

circumstantial proof that the joint account had been opened for convenience only." Fragetti, 692 N.Y.S.2d at 443. As discussed above, that one account holder contributed all the funds in the joint account does not necessarily rebut the presumption of joint tenancy under New York law. In contrast, New Jersey law would permit TD Bank to reach all funds that Michael Miller "owned beneficially" until his death -- that is, the proportion of funds in the account that Michael Miller contributed.

This difference has the potential to affect the outcome significantly, particularly in light of the parties' dispute over the value of the UBS Accounts. As discussed above, TD Bank claims that the value of the UBS Accounts at the time of Michael Miller's death was approximately $20.5 million. However, Barbara Miller asks the Court to offset the UBS Accounts' total by the approximately $17 million UBS Loan and to calculate the value of the UBS Accounts as approximately $3.5 million at the time of Michael Miller's death.

The Court cannot resolve the parties' dispute concerning the value of the accounts at this time. The notations on the Account Statements, which state the UBS Accounts were pledged to secure or guaranteeing the obligations of another account, allow a reasonable inference to be drawn in favor of Barbara Miller on this issue, and the Account Statements TD Bank

provides do not demonstrate how the funds in the UBS Accounts were ultimately used.[9]

If the value of the UBS Accounts was $3.5 million at the time of Michael Miller's death, the choice of law could potentially affect TD Bank's ability to obtain the full amount it seeks. Because the differences in New York and New Jersey law have the potential to significantly affect the outcome, an actual conflict of laws exists. Fin. One, 414 F.3d at 331 (2d Cir. 2005). The Court must therefore conduct a choice-of-law analysis. See id.

### d.   Application of New York Choice-of-Law Principles

The parties dispute whether the choice-of-law provision in the Guaranty requires the Court to apply New Jersey law to determine TD Bank's ability to reach funds in the UBS Accounts. "As a general rule, choice of law provisions . . . are valid and enforceable in [New York]." Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000) (quoting Marine Midland Bank, N.A. v. United Missouri Bank, N.A., 643 N.Y.S.2d 528, 530 (App. Div. 1st Dep't 1996)). In this case, the parties do not dispute the validity of the choice-of-law provision; rather, they dispute its scope. See Fin. One, 414 F.3d at 332. A federal district court located in New York and

---

[9] Relatedly, the Court observes that neither party provides authority to support its arguments regarding how the Court should calculate the value of the UBS Accounts.

"sitting in diversity[] [i]s bound to apply New York law to determine the scope of the contractual choice-of-law clause." Id. at 333; see Arnone v. Aetna Life Ins. Co., 860 F.3d 97, 108 (2d Cir. 2017).

The parties dispute whether TD Bank's ability to enforce the Guaranty by collecting from the UBS Accounts is an issue within the scope of the Guaranty's choice-of-law provision. TD Bank argues that the Guaranty's choice-of-law provision extends only to issues concerning Michael Miller's liability under the Guaranty and not to TD Bank's ability to collect. Instead, according to TD Bank, its ability to reach the UBS Accounts is governed by the law of the location of the property subject to its claim -- that is, the law of New York, where the UBS Accounts are located.

As discussed above, the choice-of-law provision in the Guaranty provides that:

> This Guaranty and the rights and obligations of the parties hereunder shall in all respects be governed by, and construed *and enforced in accordance with*, the laws of the State of New Jersey.

(Guaranty ¶ 24 (emphasis added).) Of note, insofar as this provision anticipates that the Guaranty will be enforced according to New Jersey law, its language is broader than many standard choice-of-law provisions, which provide only that a contract shall be "governed by and construed in

31

accordance with" a particular jurisdiction's law. E.g., Fin. One, 414 F.3d at 334 ("governed by and construed in accordance with the laws of the State of New York"); Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) ("governed by and construed in accordance with the laws of the Commonwealth of Massachusetts"); Knieriemen v. Bache Halsey Stuart Shields Inc., 427 N.Y.S.2d 10, 12 (App. Div. 1st Dep't 1980) ("governed by the laws of the State of New York"). The plain language of the Guaranty indicates that the parties intended New Jersey law to govern not only the interpretation of the Guaranty but also the enforcement of the rights and obligations it conferred on TD Bank and Michael Miller. Whether TD Bank can reach particular accounts is a question concerning enforcement of the Guaranty.

Indeed, in Marine Midland, the court considered a choice-of-law clause that similarly stipulated that one jurisdiction's law should govern enforcement. 643 N.Y.S.2d at 529. The clause at issue there "provid[ed] that New York law would govern any action brought to enforce [a promissory note's] provisions." Id. at 529, 531. The court reasoned that this choice-of-law provision extended to an issue regarding the note holder's ability to collect -- namely, the statute of limitations for claims against a decedent's estate. See id. at 530.

Finance One, cited by TD Bank, is not to the contrary. Finance One involved a derivatives trading contract with a choice-of-law provision that stated: "*[t]his Agreement* will be governed by and construed in accordance with the laws of the State of New York . . . ." 414 F.3d at 327, 332. Under the contract, Lehman Brothers admittedly owed Finance One $9.7 million. See Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc., 215 F. Supp. 2d 395, 396-97 (S.D.N.Y. 2002), aff'd, 414 F.3d 325 (2d Cir. 2005). Lehman Brothers attempted to decrease, or "setoff," this debt by purchasing certain negotiable debt instruments issued by Finance One from a related Lehman Brother's entity, independent of the derivative trading contract. Fin. One, 414 F.3d at 396-97. The Second Circuit found that the choice-of-law provision included in the derivative trading agreement did not apply to Lehman Brother's setoff rights because those rights arose from outside the agreement and "the parties declined to include within the agreement any provision creating such rights." Id. at 336 (2d Cir. 2005); see also Krock, 97 F.3d at 645 (finding the choice-of-law clause, "[t]his Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts" not "sufficiently broad" under New York law to encompass a tort claim incident to the contract).

In sum, TD Bank's claim is unlike Lehman Brothers' claim for set off rights. Lehman Brothers' set off rights arose outside the bounds of the relevant contract and hence fell outside the scope of its choice-of-law provision. In contrast, TD Bank's right to payment arose from the Guaranty. Whether TD Bank can obtain funds from the UBS Accounts is a question regarding TD Bank's ability to enforce its right to payment. And the Guaranty's choice-of-law provision clearly provides that New Jersey law shall govern enforcement of the Guaranty.

2.   <u>Application of New Jersey Law</u>

Under New Jersey law, creditors may reach all funds in a decedent's joint bank account that the decedent deposited in the account, or "owned beneficially" until his death when the decedent's estate is otherwise insufficient to satisfy the outstanding debt. <u>See</u> N.J. Stat. Ann. § 17:16I-7 (West 2020). Because Michael Miller's estate was insolvent and because the funds deposited in the UBS Accounts were income derived from the operation of Michael Miller's businesses, TD Bank can reach up to the full value of the joint account at the time of Michael Miller's death. For reasons discussed above, however, the Court cannot conclude at this time that

the value of the UBS Accounts exceeded $3,478,070.52 as of December 30, 2016.[10]

   With regard to prejudgment interest, the parties agree that the law of the jurisdiction that controls liability also governs the calculation of prejudgment interest. See Stillman v. Inservice Am. Inc., 738 F. Supp. 2d 480 (S.D.N.Y. 2010), aff'd, 455 F. App'x 48 (2012). In this case, New Jersey law applies. Although TD Bank asked that the Court apply New York law to calculate prejudgment interest, TD Bank does not contend that Barbara Miller's proposed method of calculating prejudgment interest under New Jersey law is incorrect. The Court will accordingly adopt the method Barbara Miller proposes for the calculation of prejudgment interest under New Jersey law.

   Finally, according to the terms of the Guaranty, Michael Miller agreed to pay "any and all expenses that maybe paid or incurred by [TD Bank] in the collection of all or any portion of [the] Guarantor's obligations . . . including . . . reasonable attorneys' fees." (Guaranty ¶ 2(d).) TD Bank is therefore entitled to reasonable attorneys' fees.

### IV.  ORDER

   Accordingly, for the reasons stated above, it is hereby

---

[10] Although Barbara Miller states that she subsequently used those funds to pay debts and living expenses, she identifies no authority suggesting that her depletion of the funds in the UBS Accounts has any legal effect.

**ORDERED** that the motion of plaintiff TD Bank, N.A. ("TD Bank") for summary judgment on Count One of the Amended Complaint (Dkt. No. 24) is **GRANTED** in part; and it is further

**ORDERED** that TD Bank's request for a declaratory judgment that defendant Barbara Miller ("Barbara Miller") received funds from joint bank accounts previously held in the name of Barbara Miller and Michael Miller at UBS Financial Services, Inc. ("UBS") with account numbers ending in -934, -904, and -905 (collectively, the "UBS Accounts") subject to TD Bank's claim under the Guaranty of Payment (the "Guaranty Claim") is **GRANTED**; and it is further

**ORDERED** that final judgment is entered in favor of TD Bank and against Barbara Miller in the amount of $1,847,304.63, together with prejudgment interest and reasonable attorneys' fees and costs to be assessed; and it is further

**ORDERED** that, within five days of the date of this Order, Barbara Miller shall submit a proposed order awarding prejudgment interest computed according to the method endorsed in this Order; and it is further

**ORDERED** that, within five days of the date of this Order, TD Bank shall file a Certification of Counsel and proposed order for an award of attorneys' fees in accordance with the terms of the Guaranty of Payment; within four days thereafter,

Barbara Miller shall file any objection to the amount of attorney's fees requested; within three days thereafter, TD Bank shall file any response to Barbara Miller's objection; and it is further

**ORDERED** that the transfer of Michael Miller's interest in $3,478,070.52 in the UBS Accounts to Defendant Barbara Miller is hereby set aside to the extent necessary to satisfy the Guaranty Claim; and it is further

**ORDERED** that TD Bank is hereby permitted to attach or levy upon Barbara Miller's bank accounts held at UBS, or any other bank account or property in which Barbara Miller has an interest, in order to satisfy this judgment.

**SO ORDERED.**

Dated: New York, New York
      9 September 2020

Victor Marrero
U.S.D.J.